The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. This is our first case in the morning. People of the State of Illinois v. Roger Carroll. It's 420-0491. Will the appellant please state your name please? My name is Clyde Keene and I'm here on behalf of Roger Carroll Jr. this morning. Thank you. Now the appellee. Luke McNeil. Thank you. Mr. Keene, you may proceed. Thank you, Your Honor. And thank you, Your Honors, for affording the opportunity for oral argument on this case. May it please the Court, Mr. McNeil. 725-ILCS5-107A2 was enacted in 2015 intending to improve the accuracy of eyewitness identification testimony in Illinois. It was an effort to ensure the integrity of the judicial process by setting forth pretrial identification procedures that would provide reliability and hence reduce the chance of misidentifications, something that DNA testing was tending to demonstrate was the main source of wrongful convictions when they occur. The state maintains in its brief that what it did in this case did not offend this statute and its provisions and safeguards to provide reliable identifications. What did happen, as the Court's aware, is that 10 years after the observations on a parking lot at Eunice Smith Nursing Home in Alton, the state was preparing for trial of this case in March, and approximately one month prior to trial, they brought in an eyewitness that observed a stranger on that parking lot the day that Bonnie Woodward, the victim of the murder, disappeared. They brought her in to prepare her to testify. Her name was Wanda Bosley. During that interview or preparation, the prosecutor threw the defendant's photograph up on a laptop screen and asked Wanda Bosley if that's the man you saw 10 years ago on the parking lot. She said, I'll never forget that face. That's him. Then she subsequently gave in-court identification of the defendant. The state essentially is saying this is not a statute that applies to this procedure. Show-ups can still occur because this statute only applies to lineups. Essentially, the state's argument would be that if they showed two photographs to Wanda Bosley, then they would have had to audio tape or videotape the pre-trial identification procedure. If they showed two photographs to her, they would have had to make an official report, and most importantly, with two photographs, they would have had to tell, pursuant to this statute, the defense counsel that an eyewitness identification is coming. We've gotten a pre-trial identification, and here's the procedure. But since they didn't use two photographs and therefore be non-compliant with the statute, but only one photograph, everything's okay. The statute... Do you have a case that supports your position? Pardon? Do you have a case that supports your position? No. No, I do not have a case. I don't think that there are any cases interpreting... This is a case of first impression to interpret, I suppose, the scope of this statute. I would submit that an interpretation by the state, the state's interpretation, that they can conduct highly suggestive procedure, like a photo of show-up, when they cannot conduct lineups of less than six photographs, it sort of stands the statute on its head, because it would promote a suggested procedure, rather than what its intent was, is to provide safeguards that fair and transparent procedures occur with regard to pre-trial identifications. It would actually promote the use of surreptitious photo show-ups prior to trial, without the need for disclosure or any transparency whatsoever, and that just can't be what the legislature intended. And in that regard, the state's sites to cases from the 70s and early 80s, where courts have condoned or allowed last minute submission of pre-trial identification, but the statute's call for transparency and disclosure of any pre-trial identification procedure that the state conducts, I think, coupled with learners, the Supreme Court's acceptance and recognition of eyewitness expert testimony, changed the landscape somewhat regarding the state's holding back knowledge of pre-trial identification and how it was procured. One might ask, you know, what good... Did trial counsel interview Ms. Boswin? Did they interview Ms.? No, I'm not aware that they did. Did they try to interview Ms. Boswin? I'm not aware that they did. Who's fault is that? Well, I suppose they relied on the discovery where they were relying on... Listen, I don't... I'm not here, as you know from my briefs, I'm not here in defense of defense counsel in this case and the things that they did. But in that regard, I think they were relying on the pre-trial discovery that was sent to them. What they understood the status of the situation to be is that Ms. Boswin saw a six-photo lineup of rays 11 days after her observations, after having said that she got an absolutely good opportunity to see the stranger with Ms. Woodward on the parking lot. Also, four other eyewitnesses said that they got a good opportunity and they were shown the same ray. And this was all in pre-trial discovery. And all four of them did not identify the defendant's photograph out of that six-photo array. And that's, I think, what defense counsel was operating going into trial, thinking that we're not dealing with. As a matter of fact, defense counsel got up an opening statement and said, you're not going to hear from an eyewitness in this case. I think that that was one of the harmful things that occurred by not following the statute and disclosing the pre-trial identification procedure. Because the case started out with defense counsel being made out to be a liar and not trustworthy in terms of his interpretation of the evidence in the case. There were a lot of consequences that occurred, harmful consequences that occurred. But I think, you know, it's a plein air argument. And I think the real thing is that what the state did in this case in ignoring the statute and its protections. You talk about ignoring the statute. I'm still trying to figure out what authority you have for the argument that this statute applies to pre-trial preparation at all. It applies to apprehension and investigation. It applies to police officers investigating the possible identity of a suspect. But what authority do you have that indicates that this applies to just simple pre-trial preparation by a prosecutor talking to his witness? Well, I think if in that preparation the prosecutor decides to use a pre-trial identification procedure like the show-up that they that it used. Well, no, wait. You call it a pre-trial identification procedure. And I noticed that when you were laying out the facts, you included some facts that I didn't, I don't recall seeing in the record, specifically that the prosecutor's asking her if this is the person you I think by that time, Ms. Bosley had already indicated she'd seen this guy's picture for 10 years on social media. She was already well familiar with the person. And there was no likelihood that she was going to be misidentifying him after she's already said, I'm identifying him from what I've seen at the scene. I got a good look at him at the time. I've seen him for 10 years. And she's asking her, is this the guy? And she says, yeah, that's the guy. I'm not going to forget his face. What makes that a show-up as opposed to just pre-trial preparation? Well, I guess when you put a picture of the defendant in front of a potential eyewitness who has yet to identify the individual, and then that she identifies it seems to me that that's show-up. She's already said she's seen the guy for 10 years on social media. Well, that's part of the problem, not the solution. The real test here is under the totality of the circumstances, would their in-court identification have been tainted and was it a reliable? Did all of that come out? Well, I think her seeing him on social media did come out during the course of her trial. And the fact that she didn't identify him from the photo lineup, that came out, right? That's correct. Now, she disputed that the photo lineup she was shown at trial was that was the same photo lineup that she was shown 10 years ago, but that also came out. Well, that's true, but that was starkly contradicted by Detective Jared Ford who identified the exhibit. I understand that, but my point is the jury got to hear all of that. Yes. So they could have weighed the credibility or believability of Ms. Bosley in relation to all of these other things that were brought out with regard to her identification, correct? They could have. I'm sorry, go ahead, John. Was the photo lineup presented to her during the trial the same photo lineup that it wasn't? And state had possession of the photo lineup that was shown 11 days after observations. And I think in my brief, I point out that it would have complied with two of the aspects of the statute's protections, that being that was six people. And also it would have shown the defendant as it would resemble what he looked like at the time, which are two of the requirements and the procedures set forth in the statute. Okay. I don't know if I follow that, but I guess what you're saying 11 days after the victim disappeared, she was presented a photo lineup. She could not identify the defendant, correct? Correct. Correct. Okay. But then what happened to trial? That's what I'm trying to figure out. Well, at the trial, the pretrial identification was not what happened in preparation and seeing him on the laptop was not presented on direct examination. She just gave an in court positive identification of the defendant as the person that she saw in the parking lot. Right. I understand that. I thought she said that the photo lineup that I thought she was shown during the trial was not the same as the one she was shown 11 days after the disappearance of the victim. I must have misunderstood that. She says, this didn't look like the photo that I was shown. I remember more facial hair on the individuals in the array that she was shown. But she was shown exhibit number one, which Jared Ford, the detective who compiled it back then said, this is the photo I showed the four eyewitnesses. And that would include her, right? Right. Okay. That clarifies it. Thank you. Move on then. Um, so, um, I do think too, that it's instructive to note 107 A to B allows the Supreme Court to approve any pretrial identification method other than sequential and simultaneous lineups. If that method has gained general acceptance as a reliable method that provides more accurate results than simultaneous and sequential lineups. I think the legislature here demonstrates by that provision that they are seeking accurate pretrial identification procedures rather than the use of highly suggested, unreliable photographic show ups. Um, as I stated before the state's interpretation of this statute, I think sets it on its head and promote something that was at the absolute opposite of what the legislature intended by passing 107 82. Um, the statute also calls for an official report of the pretrial procedure to state reasons for any impracticability and not strictly complying with the statute. And the statute also provides sanctions if it's not complied with. Um, that's 107 K two J. And it provides, it doesn't outlaw noncompliance. But if not a client clients occurs, it calls for that to be a factor to be weighed and whether the identification is reliable enough to be admitted into evidence by virtue of a pretrial motion. Um, the state's noncompliance with 107 82 in this case brought a host of harmful consequences upon the defendant. I've already mentioned how defense counsel made a erroneous statement to the jury, but it also foreclosed the possibility of hiring a defense expert on eyewitness evidence because the defense was not knowledgeable about the fact that an eyewitness was going to be testifying. I, I, um, the Supreme court's acknowledgement of the right to hire eyewitness expert in cases such as this is of little value if the defense is led to believe that there isn't a eyewitness by the discovery they received and not disclose the fact that an eyewitness is going to be called. Um, eyewitness expert acceptance in a case like this is important because they can dispel some of the misconceptions that are counterintuitive to layman. And particularly in this case, one of those being that positivity does not necessarily equate to accuracy. Um, so I think I've articulated the, some of the harmful consequences to the defendant. I would also maintain that the state's noncompliance also compromised the integrity and tarnish the reputation of the judicial process itself and that it constituted plain error. Okay. Does any justice have any further questions about that issue? No, no. I see none on that issue. You may continue. Pardon? I said, I see no questions on that issue. You may continue. I'll proceed with my argument and turn to the next issue. The fact that the trial court erred in forbidding the defense attorneys from reviewing Nathan Carroll's written notes pertaining to his testimony. Initially, I would state that there's probably a dispute here over the standard of review in this case. I, uh, the argument that I'm making with this is not a discovery violation argument that would be subject to an abuse of discretion standard of review. The argument here is that the subpoena issued for those written notes should have been honored instead of finding that there was attorney client privilege. I think it was air on the court port of the court to find attorney client privilege. And let me explain, uh, why, uh, Nathan initially testified that he remembers more and more information over the course of the years leading up to the trial. And he said, over these past few years, I don't think about them all all the time, the details, but I write them down when he remembers them and I share it with prosecutors. I share it in meetings with prosecutors. The state acknowledges Nathan's habit of writing down details of memories as they came to him as a method of preserving them in their response to the post trial motion. The state further acknowledges that following Nathan Carroll's testimony, Michael Metis, attorney for Nathan Carroll, obtained the reference notes from his client and reviewed them. Um, when the defendant testified ostensibly to the contents of his written memorandum, which he did, he testified in front of an open court, a number of third parties, including the prosecutors and the defense attorneys. Um, it's simply inconceivable that the attorney reviewing the notes after he's testified to the contents of those notes to third parties, that it would clothe those notes with an attorney client privilege. The notes weren't. Mr. Keene, I think you're confusing two issues. One, there was, there were 40 pages of notes that were tendered and that were used by the defense attorney on cross examination. And those 40 pages of notes were the notes that contained the conversations that had actually been included with prosecutors and people of that nature. There are then additional notes that are produced by the attorney, which he said were exclusively used between he and his client in preparation for the grand jury. And subsequently they were not disclosed to anyone. They were notes that were of their internal conversations. He corrected Nathan and said, none of these notes were, were notes between he and the prosecutor. They were notes between he and I, his defense counsel. And then the trial court with that information conducted an in-camera review and said, no, these, these are covered by attorney client privilege. What's wrong with that process? Well, um, I, um, my understanding of the facts, uh, based on what the state says is that, uh, these were these notes that he was, he compiled that were being asserted as attorney client privilege were, weren't prepared in an attorney client setting. They were prepared over time contemporaneously when he remembered events that he wanted to put down and wrote them down, preparing to tell the prosecution about them. And those were the 40 pages that were tendered contemplation of him getting an immunity, a grant of immunity for cooperation with the state. And those were the 40 pages that were tendered. Well, I, I'm not aware. There's, there's actually three different sets of notes. There's notes, which are actually marginal notes on the grand jury transcripts. There are notes then that the attorney indicated were specifically between he and his, his client. And then there were the notes that the prosecutor disclosed. And those are the 40 pages that cross examination. Okay. Well, if, if you think that these were privileged, uh, then I would just rely on what, um, cases I've cited in my brief with regard to how the Illinois privilege should be applied and, and simply maintain that the state misapplied a ninth circuit federal court that was not, uh, precedential by engaging in a quote unquote balancing test. Um, in that regard. Thank you, Mr. King, your time has expired, but you will have time on rebuttal. Thank you. Mr. McNeil, may it please the court council. Um, as to Wanda, Vasily's in-court identification, this wasn't, um, the photograph pre-trial was not an identification procedure. It had nothing to do with section 107A2. And, um, I believe there's a mischaracterization of the record as to what the prosecutor asked Vasily about the photograph page 500 of the record. Prosecutor says it's on redirect. Ms. Vasily, when I showed you the about a month ago, what did you say to me? I told you that that was definitely the man that I would never forget his face and his eyes kind of told it all. This does not say that the prosecutor asked her if this photo was the stranger that she saw. This was not a pre-trial identification and nothing in the record suggests that Vasily's identification of defendant, especially in court was based on this photograph. Well, counsel, do you think that was a proper question for prosecutor to ask? What did you say to me when I showed you this? Uh, I, I, I mean, I don't know if I would have touched on it. Hindsight's always 20-20. Um, the prior consistent statement to me, which I don't believe under these circumstances would have been admissible. Yeah, an objection may have been sustained there. Um, but I think she was trying to get to the point that, uh, this was clearly trial prep. My, my estimation would probably be that, uh, maybe this photograph on a laptop was where defendant might have been sitting, uh, acting, play acting like she's identifying him in court or whatever. Um, but the fact remains the record has nothing to say that her identification was based on this and it would be somewhat absurd. Like, um, Justice DeArmond pointed out, she, she testified that she'd seen pictures of this man for, for 10 years and she specifically testified her in-court identification was based on the observations that she saw outside of the nursing home on the day of the murder. So that, uh, rejects any, uh, contention that this photograph had anything to do with, uh, jogging her memory or anything like that. It doesn't seem like defendant's image was in dispute here and, uh, would probably would be the case since this trial took place 10 years after the murder in a small town. I'm sure that, uh, I'm sure that the news was not, um, not a stranger to this case. Um, moreover, for all these arguments, there's harmless error. There was overwhelming evidence against defendant. Wanda Basile's in-court identification of him is not what convicted him. Nathan's testimony, uh, he testified he was an eyewitness to defendant murdering Woodward, burning her body on his property and dumping the ashes in the creek. This was, this timeline was corroborated by defendant's wife, Monica, who said there was a, indeed a fire that burned for days on their property after the murder and the defendant and Nathan dumped the ashes of that fire in the creek. There were human bone fragments found in the fire pit and defendant's fingerprints were on Woodward's car and, uh, defendant claims, well, that could have happened at church, uh, but defendant denied ever touching her car to the police. So I think that's an indication of, of guilt as well. Yeah. I'm just reading through Hart's testimony. It was a little unclear to me, but if I understand what you're saying, she did explicitly say that the prints taken off of the victim's truck were the prints of the defendant or palm printing and fingerprints. Is that correct? The forensic scientists? Yes. Yes. Okay. Um, uh, I mean on appeal though, defendants arguing, well, that could have maybe happened at church, but it's indicative of guilt that defendant denied ever touching her car anywhere to the police. Um, so this is clearly not a Brady violation. The state had no duty to disclose, um, trial prep or anything like that, because this was not a pretrial identification procedure. Um, also as for, as for the opening argument, uh, defense counsel only said that nobody identified defendant in the lineup from 10 years ago. This was, uh, not a blind side and it didn't attack defense counsel's credibility because even Basile admitted that she didn't identify defendant in the lineup from 10 years ago. So this was, um, there was no prejudice to defendant, especially considering the overwhelming evidence. Um, as for an eyewitness expert, defendant knew Nathan was the most crucial eyewitness of all. So it's not like there was no eyewitness testimony expected in this case. And, um, I would argue that even if this is error, it's harmless beyond a reasonable doubt. Um, as for Nathan's notes, I would, uh, I would argue that the trial court handled that perfectly. I just want to note that the trial court did examine the notes and found that any inconsistencies, um, I don't know if they were talking about the 40 pages of notes that were admitted or the notebook that was found to be attorney client privilege at any rate. I have a question. Yeah. No court. No, no question about it. Examine some notes provided to the court through a subpoena from defense counsel for Nathan, right? Yes. The notes say I can't find anything in the briefs or in the, the only thing that the trial court said is that there were no inconsistencies from Nathan. I'm not asking what the trial court said. I don't, we're asked to review whether the court made a mistake. Well, how would I know if I don't know what the notes said? Well, I would, they've been preserved for the record and sealed or something. I don't think they're part of this record that the notes that were not admitted or, or allowed to be examined, but the standard of review as to whether the court made a mistake in ruling on defense motion to be allowed to examine those notes. What's our standard. I think that we would presume that absent on the complete record that the trial court handled this properly. It's a palance burden to, to supply a complete record on appeal. Well, and what abuse of discretion, is that what you're saying now is our standard? Yes. Yes. And here the trial court noted that any inconsistencies were already elicited on cross-examination based on the earlier grand jury testimony. I know what the trial court said, but how can this court determine whether the trial court was correct in making its ruling, unless we get to see those notes, which it seems to me they should have been preserved for and the record was sealed, but whatever, maybe I'm, maybe I'm all wrong about that. Well, I don't think that would have been the state's burden though. The state's burden? No, I do not think it would have been your burden to do that. But yes, as, as you noted, and I think you already are well aware of that. They noted the trial court noted that any, any other statements contained in there would have been prior consistent statements to Nathan's testimony and presumably inadmissible anyway. This was not error. And of course, based on the overwhelming evidence, again, Nathan's notes were not what convicted defendant. It was Nathan's recollection, eyewitness of defendant murdering Woodward. And of course, this isn't a Brady or 412 violation because the state was never in possession of this notebook that the personal attorney of Nathan had. Moving on to Monica, defendant's wife testifying about defendant abusing her. There was a hearing on this as well. And the state argued that this would be part of a coherent narrative exception to other crimes evidence. Nathan testified, he spent eight years trying to forget the murder and two years trying to remember everything he could. This coincides with when the abuse happened. The police officer also testified that this investigation was reopened as a result of them investigating the abuse of defendant did to Monica. So this provided some context probative context to the jury as to why this took 10 years and as to why was the murderer. I suppose the state could have fleshed this out more in questioning, but that's in hindsight. The point is the trial court didn't abuse this discretion when allowing this other crimes evidence before Nathan's testimony. And still, as with all the other arguments, Monica's testimony about defendant's abuse is not what convicted defendant. It was the overwhelming evidence that he murdered Woodward. As for Monica and defendant's pending divorce, trial court correctly handled that issue as well. This was a complete fishing expedition by defense counsel. And there was no evidence suggesting a financial motivation. And we know that because Monica specifically testified outside of the jury's presence that there was no divorce proceedings had nothing to do with whether defendant was going to be convicted or not. And the trial court properly limited that cross because it was irrelevant and speculative. And it's clear that defendant waived this issue by acquiescence to the trial court's handling of this procedure. So it would be barred under the invited error doctrine here about Nathan's testimony that he killed dogs on the property. This it would basically have to be a sua sponte striking of this testimony, which would be a drastic decision by the trial court when the value to defense was pretty easy to spot when there were bone fragments found. Some of them weren't conclusive to be human. The defense could somewhat argue that there might be dog bones that could be a road that they went down. So the trial court did not err in making a drastic decision to strike testimony that very well could have been valuable to the defense at that point, because there was no objection to the question about defendant killing dogs. It was only why defendant killed the dogs. It was based on relevance. And as to ineffective assistance, all of these claims we already talked about, they came down to either trial strategy or preserving meritless issues. However, the easiest way to dispose of this is by prejudice prong of Strickland. The evidence against defendant was overwhelming. None of these claims have anything to do with Nathan's credible testimony that defendant indeed murdered Woodward. So both prongs of Strickland fail here, and there was no ineffective assistance. And I would be happy to take any questions about any of the issues. If not, I would ask this court to affirm. I have a question. Yeah. Is it conclusive that some of the bones found were human? Yes, and apparently could not be found or it was not conclusive that they were Woodward's. Right. But human? Yes. But there were 25 bone fragments that could not be found to be human or could not or weren't able to be tested or something like that. My next question is, you pointed out how the question regarding shooting two dogs could have actually worked to the defendant's advantage. But what was the purpose of the prosecutor asking that question? I don't know. It kind of came out of left field. And when I was reading through, it seemed like maybe not a wise question to ask precisely because of the defense that might rise from that. But I don't know. But only being two dogs, it's a rural setting. When I grew up, that's how my dad put down our dogs when we were old. So I don't think it necessarily suggested a sinister motivation by killing two dogs over the lifetime of his child. It doesn't sound too outlandish, especially when they're on a farm. I don't know what it could have suggested and why the prosecutor would ask him, but whatever. Yeah. You answered the question. So that's all I have. Thank you. All right. Thank you, Mr. Kane. Rebuttal. Your Honor, evidence of another crime is admissible if it is part of a continuing narrative of the events giving rise to the offense. And when facts concerning uncharged conduct are all part of a continuing narrative which concerns circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes. That's directly from Carter. The continuing narrative exception didn't apply to Monica Carroll's testimony. And it was not emphasized to the court prior to allowing her to testify. What the state said was this is for background. And I expect that Nathan will testify this is going to be one of the reasons that he decided to come forward. What the state expected did not mature because she steered clear completely of asking him his motivation in testifying. It was never asked. And I don't know whether it was oversight or she knew what the answer was going to be and it wouldn't have been what she expected. But nonetheless, there was no proof of the reason that was stated other than propensity. And I will tell you that the kind of evidence that the state was allowed to put in with regard to Monica Carroll, the evidence of the assault on Monica Carroll trumpeted the defendant's propensity for violence in a very stark way. The use of the state now on the appeal of the continuing narrative exception is tied in some way to the expectation of Nathan being coming forward and testifying because of the assault. But he didn't testify to that. And um, the exception simply does not exist to allow speculation on why a witness provided testimony in a case. It needs to be linked, lead up to the commission of the offense charged or be linked in a way that connects it and intertwines the charged offense. And I think that the state's evidence in this case failed to do that and that it really wasn't any reason to justify admission of other crimes. Evidence is particularly the egregious other crimes evidence that was admitted in front of this jury. I think it was very harmful and very damaging and not. I think it was air to admit it. Um, I've entertained any questions the court might have. Okay. I see no additional questions. Gentlemen, thank you for your argument. We'll take this matter under advisement and await the readiness of the next case. Thank you.